FILED
TARRANT COUNTY
12/12/2024 2:01 PM
THOMAS A. WILDER
DISTRICT CLERK

CAUSE NO. ___342-360258-24___

| | | |
|---|---|---|
| **345 PARTNERS SPV2 LLC, GRANT FAIRBAIRN, AS TRUSTEE AND ON BEHALF OF GRANT FAIRBAIRN REVOCABLE TRUST, NINA FAIRBAIRN, AS TRUSTEE AND ON BEHALF OF NINA CLAIRE FAIRBAIRN REVOCABLE TRUST, RICHARD FULLERTON, WILLIAM HO, AS TRUSTEE AND ON BEHALF OF GR FAIRBAIRN FAMILY TRUST, NCF EAGLE TRUST, GRF TIGER TRUST, AND NC FAIRBAIRN FAMILY TRUST, SCOTT KINTZ, AS TRUSTEE AND ON BEHALF OF KINTZ FAMILY TRUST, JACOB RUBIN, TRANSCEND PARTNERS LEGEND FUND LLC, VALLEY HIGH LP, JERALD WEINTRAUB, AS TRUSTEE AND ON BEHALF OF JERALD AND MELODY HOWE WEINTRAUB REVOCABLE LIVING TRUST DTD 02/05/98, AS AMENDED, AND MIKE WILKINS, AS TRUSTEE AND ON BEHALF OF WILKINS-DUIGNAN 2009 REVOCABLE TRUST** | § § § § § § § § § § § § § § § § § § § § § | **IN THE DISTRICT COURT** |
| | § § § | |
| **Plaintiffs,** | § § | |
| **v.** | § § § | **NO. _____** |
| **NATHAN NICHOLS, CHASE BLACKMON, CAMERON BLACKMON, NICHOLAS CERASUOLO, AND IMPERIUM INVESTMENTS HOLDINGS, LLC** | § § § § § § § § § | |
| **Defendants.** | § | **TARRANT COUNTY, TEXAS** |

**EXHIBIT A**

Copy from re:SearchTX

<u>**PLAINTIFFS' ORIGINAL PETITION**</u>

Plaintiffs 345 Partners SPV2 LLC, Grant Fairbairn, as Trustee and on behalf of the Grant Fairbairn Revocable Trust, Nina Fairbairn, as Trustee and on behalf of the Nina Claire Fairbairn Revocable Trust, Richard Fullerton, William Ho, as Trustee and on behalf of the GR Fairbairn Family Trust, NCF Eagle Trust, GRF Tiger Trust, and NC Fairbairn Family Trust, Scott Kintz, as Trustee and on behalf of the Kintz Family Trust, Jacob Rubin, Transcend Partners Legend Fund LLC, Valley High LP, Jerald Weintraub, as Trustee and on behalf of the Jerald and Melody Howe Weintraub Revocable Living Trust DTD 02/05/98, as amended, and Mike Wilkins, as Trustee and on behalf of the Wilkins-Duignan 2009 Revocable Trust (collectively, "Plaintiffs") file this Original Petition ("Petition" or "Pleading") against Nathan Nichols, Chase Blackmon, Cameron Blackmon, Nicholas Cerasuolo, and Imperium Investments Holdings, LLC (collectively, "Defendants")[1] in the above-referenced lawsuit (this "Action") and, in support thereof, show as follows:

<u>**BRIEF SUMMARY OF THE FRAUD**</u>

Plaintiffs are the victims of a scheme of deception and brazen self-dealing. Defendants, the founders, executives, and management team of the Rhodium bitcoin mining enterprise, conned Plaintiffs into investing millions of dollars into Rhodium. Defendants intentionally misled and lied to Plaintiffs to secure their multi-million-dollar investment so that Defendants could personally enrich themselves and Imperium.

---

[1]     Other parties involved in Defendants' scheme include a group of companies that are now debtors in a chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the Southern District of Texas, including Rhodium Enterprises Inc. ("Rhodium Enterprises"), Rhodium Encore LLC ("Rhodium Encore"), Rhodium JV LLC ("Rhodium JV"), Rhodium Renewables LLC ("Rhodium Renewables"), Rhodium Technologies LLC ("Rhodium Technologies"), Rhodium Shared Services LLC ("Rhodium Shared Services") (collectively sometimes referred to as "Rhodium").

---

**EXHIBIT A**

Copy from re:SearchTX

Defendants set their scheme into motion before Plaintiffs even invested in Rhodium. Specifically, Defendants knew – ***before Plaintiffs made their multi-million-dollar investment*** – that Whinstone US Inc. ("Whinstone"), owner of the facilities for Rhodium's bitcoin mining operations in Rockdale, Texas ("Rockdale Facility"), was being sold to one of Rhodium's direct competitors – Riot Blockchain, Inc. ("Riot").

Frankly, it is hard to imagine a more material disclosure event, and had Defendants disclosed this critical information, as they were required by law, Plaintiffs would not have invested in the first place. Defendants intentionally and wrongfully withheld this crucial fact (*i.e.*, that the Rockdale facility would be owned by a direct competitor of Rhodium) to secure Plaintiffs' multi-million-dollar investment in Rhodium Encore. As they say, the proof is in the pudding. The wildly dysfunctional and adversarial relationship between Rhodium and Riot (which includes shutdowns led by Riot's armed security) is one of, if not the, key reasons behind Rhodium's bankruptcy filing and substantial harm to Plaintiffs.

Not satisfied with the original scheme, Defendants induced Plaintiffs to swap their economic interests at Rhodium Encore for interests at Rhodium Enterprises (the "Roll-up Transaction") based on Defendants' promises of further project completion at the Rockdale Facility. Defendants and Imperium directly benefitted from the Roll-up Transaction which, in essence, left Plaintiffs structurally subordinated to Imperium's recoveries and gave Imperium an over-inflated "control premium" as part of the Roll-up Transaction.

Defendants consistently attempted to conceal their fraud and create the illusion of transparency by providing Plaintiffs false assurances – sending 10,000+ personal text messages to Plaintiffs in 2021 alone and over 1,000 e-mails from non-Rhodium e-mail addresses, among other forums. However, Defendants hid their fraudulent ruse by repeatedly denying Plaintiffs access to

Copy from re:SearchTX

**EXHIBIT A**

books and records and intentionally creating a "black box" with respect to Rhodium's financial condition – rejecting and resisting true and fair transparency at every turn.

In addition to the direct harm suffered by Plaintiffs at the hands of Defendants, as pled in this Petition, Plaintiffs have indirectly suffered harm as a result of Defendants' mismanagement of, and self-dealing transactions with, Rhodium. Because Rhodium and its affiliates are debtors in a bankruptcy proceeding, Plaintiffs are not herein seeking to recover those indirect damages but make reference to Defendants' misconduct in those transactions as further context for the direct harm suffered by Plaintiffs.

Put simply, Defendants lied to, and stole from, Plaintiffs. Defendants must be held accountable.

## MONETARY CATEGORY

1.      Pursuant to Texas Rule of Civil Procedure 47, Plaintiffs state that they seek both monetary and non-monetary relief. The monetary relief sought by Plaintiffs *far exceeds* $1,000,000.

2.      At the time of filing this Pleading, the damages are continuing and increasing. Plaintiffs' investigation is continuing. Accordingly, the monetary category is an estimate at this time and is subject to being increased, decreased, or otherwise amended.

## DISCOVERY CONTROL PLAN

3.      Discovery should be conducted under Level 3 pursuant to Texas Rule of Civil Procedure 190.4 and a motion is hereby made for entry of a Level 3 Scheduling Order.

## THE PARTIES AND SERVICE

4.      Plaintiff 345 Partners SPV2 LLC is a California limited liability company.

5.      Plaintiff Grant Fairbairn is a trustee of the Grant Fairbairn Revocable Trust and, in

**EXHIBIT A**

Copy from re:SearchTX

such representative capacity, is authorized to and brings the claims set forth herein on behalf of the Grant Fairbairn Revocable Trust.

6.      Plaintiff Nina Fairbairn is a trustee of the Nina Claire Fairbairn Revocable Trust and, in such representative capacity, is authorized to and brings the claims set forth herein on behalf of the Nina Claire Fairbairn Revocable Trust.

7.      Plaintiff Richard Fullerton is an individual and resident of the State of California.

8.      Plaintiff William Ho is a trustee of the GR Fairbairn Family Trust, the NCF Eagle Trust, the GRF Tiger Trust, and the NC Fairbairn Family Trust and, in such representative capacity, is authorized to and brings the claims set forth herein on behalf of the GR Fairbairn Family Trust, the NCF Eagle Trust, the GRF Tiger Trust, and the NC Fairbairn Family Trust.

9.      Plaintiff Scott Kintz is a trustee of the Kintz Family Trust and, in such representative capacity, is authorized to and brings the claims set forth herein on behalf of the Kintz Family Trust.

10.      Plaintiff Jacob Rubin is an individual and resident of the State of California.

11.      Plaintiff Transcend Partners Legend Fund LLC is a Delaware limited liability company.

12.      Plaintiff Valley High LP is a Nevada limited partnership.

13.      Plaintiff Jerald Weintraub is a trustee of the Jerald and Melody Howe Weintraub Revocable Living Trust DTD 02/05/98, as amended and, in such representative capacity, is authorized to and brings the claims set forth herein on behalf of the Jerald and Melody Howe Weintraub Revocable Living Trust DTD 02/05/98, as amended.

14.      Plaintiff Mike Wilkins is a trustee of the Wilkins-Duignan 2009 Revocable Trust and, in such representative capacity, is authorized to and brings the claims set forth herein on

**EXHIBIT A**

Copy from re:SearchTX

behalf of the Wilkins-Duignan 2009 Revocable Trust.

15.    Defendant Chase Blackmon is an individual and resident of the State of Texas, and upon information and belief, resides at 4412 Summercrest Ct., Fort Worth, 76109 in Tarrant County, Texas, and may be served by serving the citation and a copy of this Petition on him at such address or wherever he may be found.

16.    Defendant Cameron Blackmon is an individual and resident of the State of Texas, and upon information and belief, resides at 2204 Mistletoe Blvd., Fort Worth, 76110 in Tarrant County, Texas, and may be served by serving the citation and a copy of this Petition on him at such address or wherever he may be found.

17.    Defendant Nathan Nichols is an individual and resident of the State of Texas, and upon information and belief, resides at 3000 Gracie Kiltz Ln, Apt 307, Austin, TX 78758, and may be served by serving the citation and a copy of this Petition on him at such address or wherever he may be found.

18.    Defendant Nicholas Cerasuolo is an individual (and potentially a resident of the State of Texas) doing business in Texas, and upon information and belief, resides at 655 Ave Roberto H Todd, Suite 187, San Juan, PR 00907-3975 and/or in Texas, and may be served by serving the citation and a copy of this Petition on him at such address or wherever he may be found.

19.    Imperium Investments Holdings LLC is a Wyoming limited liability company with, upon information and belief, Defendants Nathan Nichols, Chase Blackmon, Cameron Blackmon and Nicholas Cerasuolo serving as its managing members. Upon information and belief, Imperium maintains a principal office located at 7546 Pebble Drive, Fort Worth, Texas 76118. Imperium may be served with process through its registered agent: Corporation Service Company, 1821

**EXHIBIT A**

Copy from re:SearchTX

Logan Avenue, Cheyenne, Wyoming 82001.

20.     Each Defendant may be served by serving this Pleading, citation, and service under the Rules.

## JURISDICTION AND VENUE

21.     Numerous of the Defendants reside in Tarrant County. Moreover, Defendants were doing business in Tarrant County, Texas at all times relevant to this Action and did business in Tarrant County, Texas that caused, in whole or in part, the injuries and damages that are the subject of this Action. Therefore, jurisdiction and venue are proper in Tarrant County, Texas.  Because there are multiple defendants, Plaintiffs' claims arise out of the same transaction, occurrence, or series of transaction or occurrences, and venue is proper as to one Defendant, venue is proper as to all Defendants. See TEX. CIV. PRAC. & REM. CODE § 15.002(a)(l),15.005. As a direct and proximate result of Defendants' actions and/or inactions, damages in excess of the minimum jurisdictional requirements of this Court were incurred. The damages suffered include, but are not limited to, the loss of the use of money.

22.     All conditions precedent to all relief being sought by Plaintiffs in this Action were met, performed, occurred, and/or waived.

## PUNITIVE DAMAGES – NO CAP

23.     A plaintiff who successfully prosecutes a suit by proving malice by clear and convincing evidence can recover exemplary damages under Section 41.003(a)(2) of the Texas Civil Practice and Remedies Code. Punitive damages are sought for the fraud perpetrated by Defendants in this case. Accordingly, any statutory caps are inapplicable.

**EXHIBIT A**

Copy from re:SearchTX

## <u>FACTUAL BACKGROUND</u>

***Rhodium's Bitcoin Mining Business***

24.    Rhodium Encore is part of a large bitcoin mining operation in Rockdale, Texas. Rhodium Encore secured investments, including from Plaintiffs, for costly equipment necessary to successfully mine bitcoin.  Defendants wove a complicated web of Rhodium-related entities as holding companies, operating entities, or investment vehicles – which, in hindsight, helped them effectuate and conceal their fraudulent scheme.

25.    The various Rhodium entities were controlled by Defendants, who fraudulently induced Plaintiffs' significant investment in promissory notes and equity issued by Rhodium Encore (the "Investment").

***Material Information Withheld Prior to Investment: Whinstone Selling to Rhodium's Direct Competitor – Riot***

26.    Prior to the Investment, Whinstone's then owner, Northern Data, agreed to sell Whinstone – and, as a result, the Rockdale Facility – to Riot (the "Riot Transaction").  Below is the telling December 2020 text exchange between Defendant Nathan Nichols, the executive leader of Rhodium, and Chad Everett Harris, the then CEO of Whinstone:

> *Chad*:  ND is selling to Riot
>
> *Nathan*: Oh s**t. You called it….
>
> *Nathan:* Is it cool to tell the partners?
>
> *Chad*:  Tell your guys but stop it w Chase Cameron and Nick
>
> *Chad*: They said yes to 19
>
> *Nathan*: Will do. Nick and I will come over in 45 minutes to discuss if you're available?

**EXHIBIT A**

Copy from re:SearchTX

27.    As shown by the text message above (and others between Defendant Nichols and Harris), all Defendants knew about the Riot Transaction and ***intentionally*** concealed this material information from Plaintiffs – all while Defendants knew that their knowledge of the Riot Transaction made other representations they made to Plaintiffs, for the purpose of inducing Plaintiffs into making the multi-million-dollar Investment, untrue. This is a textbook example of fraudulent inducement.

28.    Unlike Whinstone, which housed the facilities for actual bitcoin miners like Rhodium Encore (*i.e.*, just a landlord), Riot was a self-miner and, thus, a direct competitor of Rhodium Encore (*i.e.*, a landlord plus competitor).  With the Riot Transaction, Rhodium Encore's long-term future at the Rockdale Facility would be tenuous, at best, given Riot's self-interested incentive to expand its own operations and take advantage of the cheap power contracts available from Whinstone. Indeed, Defendant Nichols' own communications with Chad Harris (then CEO of Whinstone) underscore Defendant Nichols and Rhodium's concerns regarding their position post-Riot purchase of Whinstone, and that it could "open a pandora's box of possibilities that could indirectly give you less control than you do now," "really complicate things for our growth trajectory," and was "the devil you know versus the devil you don't."  After completion of its purchase, Riot crowed in a press release that the acquisition of Whinstone "created a very clear path for the Company's future growth" (*i.e.*, using the Rockdale Facility and its low power contracts for Riot to mine bitcoin profitably). Riot made clear that it was going to develop for itself – not Rhodium – most, if not all, of the Rockdale Facility. This information was knowingly and intentionally withheld from Plaintiffs to secure their significant Investment.

29.    Plaintiffs had no way to discover the material information that was intentionally being withheld from them by Defendants until Riot issued a press release regarding the Riot

Copy from re:SearchTX

**EXHIBIT A**

Transaction in April 2021 – unfortunately, a few months after Plaintiffs made their Investments.[2] Plaintiffs' reaction to the news contained very serious questions and existential and destructive competitive concerns in writing including: (1) "Is Riot going to block you from expanding?" (2) "They will want your trade secrets right somehow?" [Response from Defendant Nichols: "Of Course."] (3) "Maybe you need additional security measures" (4) "Maybe they will hire away your workers and supervisors" (5) "Riot can now claim they have far more miners because the public won't know the profit split … They have essentially hijacked your thunder and normal people don't know."

30.     In response, Defendants provided false assurances: "(1) (in response to blocking expansion): "Not at all, but this is why we're moving to Waco." (2) "Riot wants us here, Whinstone wants us to build building D." (3) "I think it's a good thing though. Most importantly because I've talked to Jason and they will now have credit worthiness for TXU because it's a US public company. Margin calls evaporate."

31.     If Plaintiffs had known of this crucial and highly material information about the Riot Transaction, then Plaintiffs would never have invested in the first place. If there was ever any doubt regarding the materiality of the Riot Transaction and corresponding obligation for Defendants to disclose same (there should not be), such doubt was put to rest by statements made by Rhodium in its bankruptcy proceedings. For example, Rhodium has accused Riot of "simply wanting to stamp out a competitor in Rhodium because it stands in the way of Riot being able to make more money. Riot searched high and low for any reason to justify terminating the valuable power contacts." Rhodium further stated:

---

[2]     To the extent necessary, Plaintiffs affirmatively plead that the discovery rule applies to the causes of action asserted by Plaintiffs in this lawsuit.

**EXHIBIT A**

Copy from re:SearchTX

"After Riot purchased Whinstone, it started digging into Whinstone's 'legacy contracts' and realized it did not like the terms. Riot then started a campaign to get out of the contract. Riot doesn't want any tenants at Rockdale. Rather, Riot wants to expand its own mining operations, and to do that, it needs Rhodium's power and the infrastructure Rhodium paid to build out. Riot has not been coy about this: It has repeatedly told its investors it is trying to get out of Whinstone's 'legacy contracts' so it can use Rhodium's power and space for itself."

32.     There is no question that the Riot Transaction was a material fact that (i) was known by Defendants, *and* (ii) Defendants (as individuals and not as officers and managers of Rhodium) were obligated to disclose to Plaintiffs. Had Plaintiffs been made aware that they were investing millions of dollars in a startup with limited capital (Rhodium) that was pitted against an industry behemoth with over $1 billion in cash reserves (Riot) in a fight over the very power contracts that were being touted by Defendants as worth hundreds of millions of dollars and the security for Plaintiffs' investment, Plaintiffs never would have invested in the first place. Defendants must be held responsible for their knowing failure to disclose, and intentional concealment of, this critically material information, including their subsequent direct misrepresentations to Plaintiffs.

***Plaintiffs' Investment in Rhodium Encore***

33.     In or about January 4 - February 5, 2021, Plaintiffs loaned to Rhodium Encore, via promissory notes (the "Notes") backed by security agreements ("Security"):

| | |
|---|---|
| Valley High LP | $11,550,000.00 |
| Richard Fullerton | $2,100,000.00 |
| Transcend Partners Legend Fund LLC | $1,750,000.00 |
| Jerald and Melody Howe Weintraub Revocable Living Trust DTD 02/05/98, as amended | $1,400,000.00 |
| The GR Fairbairn Family Trust | $700,000.00 |
| The Grant Fairbairn Revocable Trust | $700,000.00 |

**EXHIBIT A**

Copy from re:SearchTX

| | |
|---|---|
| The Nina Claire Fairbairn Revocable Trust | $700,000.00 |
| The NCF Eagle Trust | $700,000.00 |
| The GRF Tiger Trust | $700,000.00 |
| The NC Fairbairn Family Trust | $700,000.00 |
| Wilkins-Duignan 2009 Revocable Trust | $630,000.00 |
| 345 Partners SPV2 LLC | $250,000.00 |
| Jacob Rubin | $200,000.00 |
| Kintz Family Trust | $140,000.00 |

The maturity date for the Notes was originally July 30, 2024, and with extension, August 30, 2024.

The total Investment (debt plus equity) was approximately $33 million.

34.    Rhodium Encore was initially very profitable in its first year or so of operations. Indeed, Rhodium Encore was so profitable that it generated enough cash in ten months of being online, by April 2022,[3] to fully pay back Plaintiffs.  Eventually, with bitcoin prices falling, Rhodium Encore mining operations started to flatten-out, which would normally necessitate capital preservation until bitcoin prices rebounded. In addition, it was represented to Plaintiffs, when making their investment, that Rhodium Encore would generate cash to pay back the debt and adequately preserve cash to refresh its machine fleet at the appropriate time (3-4 years after the initial machines were installed and used).  But Defendants failed to direct Rhodium to take any reasonable actions:  Rhodium did not pay back the debt holders, like Plaintiffs, when generating

---

[3]    This time period should have been even more lucrative for Rhodium Encore.  In February 2021, during a deep, prolonged freeze that crippled the Texas electrical grid (Winter Storm Uri), Defendants settled/released Rhodium Encore's right to substantial compensation from the lost bitcoin mining (and leverage to negotiate with electricity spiking to $9,000 per KWh) for just pennies on the dollar, or tens of millions of value to Rhodium Encore.

**EXHIBIT A**

Copy from re:SearchTX

significant cash; and Rhodium did not preserve sufficient cash to weather volatility in bitcoin mining operation costs (*i.e.*, fluctuations in bitcoin prices). Instead, Defendants directed Rhodium to use Plaintiffs' secured Investment to prop-up other failing bets with little protection to Plaintiffs. Why? Because Defendants were solely concerned with their self-interests and preserving the chance for the "moon shot" that would propel Defendants into realms of untold personal wealth. Plaintiffs look forward to Rhodium pursuing its own causes of action against Defendants for mismanagement and self-dealing as a means to recover value for Rhodium's creditors, like Plaintiffs.

***The Roll-up Scheme / Promise to Pay Notes / Defendants Increase Equity***

35.     In 2021, Defendants devised a scheme to inflate future growth projects – falsely promising Plaintiffs substantial upside from the expansion of operations both at the Rockdale facility (through Building D) and Temple – to induce Plaintiffs into converting part of their Investment to equity in Rhodium Enterprises in preparation for an imminent IPO or SPAC merger. As early as February 2021, Defendant Nicholas assured Plaintiffs that Building D was "100% a go." On April 28, 2021, the same day Riot announced its acquisition of Whinstone, Defendant Nicholas falsely claimed that Whinstone was contractually obligated to build Building D and emphasized that the partnership between Rhodium and Whinstone had "never been stronger." Moreover, before completing the Roll-up Transaction, Rhodium had a lengthy (approximately 5 hour) meeting with Riot about their inability to properly operate Building C. That was around the same time Defendants signed a release with respect to Winter Uri credits.[4] To induce Plaintiffs to

---

[4] During Winter Storm Uri, Whinstone sold power back to the grid at rates as high as $9,000/MW, compared to Rhodium's $17/MW contract. Defendants were very excited about the substantial amount of reimbursement that would result and led Plaintiffs and other investors to believe that a huge windfall was coming. But this soon morphed into the next chapter of Defendants' deception and shifting narratives. Despite Whinstone securing approximately $125 million in cash and credits, Defendants represented to Plaintiffs that Whinstone was never paid, and Defendants signed a release for the Uri credits – allegedly to

**EXHIBIT A**

Copy from re:SearchTX

enter into the Roll-up Transaction, Defendants intentionally concealed and failed to disclose their increasing problems with Riot.

36.     These misrepresentations, along with the others described in this section (the "Roll-up Fraudulent Statements"), intentionally created the illusion of growth for the purpose of enticing Plaintiffs into a transaction designed to strip Plaintiffs of crucial protections tied to their original investment agreements.

37.     With this Roll-up Transaction moving a part of Plaintiffs' Investment from Rhodium Encore to Rhodium Enterprises Inc., Defendants orchestrated the divestment of Plaintiffs' economic interests in Rhodium Encore, as Rhodium Encore membership interests (previously held by Plaintiffs, among others) were ultimately transferred to Rhodium Technologies, an entity which Imperium controls.[5]  To induce Plaintiffs to agree to the Roll-up Transaction, and in addition to the material misrepresentations Defendants made regarding Building D, Defendants intentionally misrepresented to Plaintiffs that they would ensure the Roll-up Transaction did not impact Rhodium Encore's commitment or ability to repay the Notes.  In fact, Defendants represented to Plaintiffs that the Notes would be repaid in full "on or ahead of schedule" with Rhodium Encore's cash/assets:

---

cover production losses (which raises serious doubts as to why a release was needed if no payment was made). Defendant Nichols texted Whinstone's CEO, estimating they were making "$20-$30M by the end," while telling Plaintiffs that Whinstone was "owed $40-$50M in credits." Rather than investigate this discrepancy between up to $50 million and Whinstone's claim of $0 in payments, Defendants were focused on selling $50 million of their own stock and arranging miner arbitrage deals for their own self benefit, neglecting to secure up to $62.5 million for their investors.

[5]     Around this time, Imperium, which is owned by Defendants, cashed out nearly $45 million, creating a significant tax liability. Upon information and belief, in December 2020, Defendants changed Rhodium Technologies' bylaws to shift the $13.5 million tax burden onto the company, *i.e.*, the investors. This appears to have been disguised as a "distribution," with Defendant Nichols dismissing it as "phantom income tax."

---

EXHIBIT A

Copy from re:SearchTX



38.    While Defendants made false promises to Plaintiffs that Building D was "100% a go," Rhodium's "partnership" with Whinstone had "never been stronger," and Rhodium had a signed contract related to Building D, recently discovered communications (specifically, communications between Defendants and third-parties during the relevant time) reveal the truth: Defendants knew – before the Roll-up Transaction – that Rhodium could not raise sufficient funding for the buildout of Bulilding D. Defendants were acutely aware that the promise of expanding to Building D would induce Plaintiffs into the Roll-up Transaction, and Defendants flat out lied to Plaintiffs regarding same. For example, despite knowing that expansion into Building D would not happen, Defendants continued promoting Building D's 100MW potential in presentations to hype, and double down on, Rhodium's promised growth. Each of these misrepresentations directly benefited Defendants through enriching Imperium, to the detriment of Plaintiffs.

39.    Notwithstanding the representations Defendants were making to Plaintiffs, by late April 2021, Defendant Nicholas was already admitting to Winstone's CEO that the economics of Building D were unsustainable, stating: "I need it to make economic sense to build here, and

Copy from re:SearchTX

**EXHIBIT A**

$550k/megawatt ($11.11MM) is not that." Did Defendant Nicholas disclose his concerns to Plaintiffs? Of course not.

40.     By early May 2021, Defendant Nicholas informed a third-party in the industry that Rhodium was abandoning Building D entirely. Unbelievably, in the same month during management presentations pitching the Roll-up Transaction (and to fraudulently induce Plaintiffs), Defendants falsely projected 300MW of growth – despite Rhodium only having 55MW of operational capacity. It was made clear that the 300MW of projected growth related to Building D, which – by the time of the May 2021 Roll-up presentations – Defendants already knew was a dead deal.

41.     During these same presentations, Defendants further misrepresented that they projected $3 billion as a base valuation for the next round of financing. Incredibly, despite knowing that the Building D buildout/expansion would *not* happen, Defendants represented that the $3 billion valuation was conservative given the expected upside from Building D and Temple.[6] With respect to Temple, Defendants misled Plaintiffs by claiming that Temple's costs would mirror those of Rockdale – requiring minimal capital and no equity dilution. Defendants knew this was untrue (also failing to disclose that Temple lacked a competitive energy contract – a critical factor for investors) but created the false narrative to hide the reality of Temple's economic impracticality (just like Defendants were doing with respect to Building D). It is truly hard to imagine more blatant and material misrepresentations to investors.

---

[6]     Unbeknownst to Plaintiffs, in March 2021, prior to the Riot Transaction announcement, Defendants sold approximately $32 million of personal stock to another investor at approximately the $3 billion valuation – so Defendants needed to maintain their artificial valuation to avoid jeopardizing their self-interested transaction.

**EXHIBIT A**

Copy from re:SearchTX

42.     Indeed, notwithstanding their representations to Plaintiffs to the contrary, Defendants never intended to, and did not, cause Rhodium to implement any protections to ensure that Rhodium Encore's secured cash/assets would be reserved for repayment of Rhodium Encore's debt. Instead, Defendants maneuvered to weaken Plaintiffs' rights and Investment protections. Defendants wanted to use Rhodium Encore's substantial cash/assets as a "piggy bank" for other, non-related projects, and tricked Plaintiffs into agreeing to the Roll-up Transaction as a means to that end. Moreover, given Defendants had already pocketed approximately $32 million from their personal (and undisclosed) sale of stock and thus securing their own financial safety net, Defendants' plan was to "moonshot" and "go for broke" with their investors' money. Unfortunately, this type of malfeasance and self-dealing by Defendants is what landed the Rhodium enterprise in bankruptcy. As indicated above, Plaintiffs look forward to Rhodium seeking recoveries from Defendants related to damage caused to the Rhodium debtors.

43.     Notably, in a similar Rhodium project (Rhodium 30MW) Defendants were creditors collectively investing approximately $2.37 million.  Following the Roll-up Transaction, unlike with Rhodium Encore, Defendants ensured that their Rhodium 30MW investment was fully paid back to them. Furthermore, Defendants (through Imperium), used the complicated Roll-up Transaction process as a means to extract and steal an additional 6.5% of the value of Rhodium Encore (and other similar Rhodium-related operating entities).

44.     The Roll-up Transaction involved two steps. First, the non-Imperium investors in the operating companies Rhodium 30MW, LLC, Rhodium Encore, LLC, Rhodium 10MW, Rhodium 2.0, LLC, and Jordan HPC, LLC ("Operating Companies"), including Plaintiffs, and the non-Imperium investors in Rhodium Technologies exchanged their interests in the Operating Companies and Rhodium Technologies, respectively, for shares in Rhodium Enterprises. Second,

**EXHIBIT A**

Copy from re:SearchTX

after all the non-Imperium interests in the Operating Companies were contributed to Enterprises, Defendants caused Rhodium Enterprises to contribute all its interests in the Operating Companies to Technologies in exchange for interests in Rhodium Technologies.

45.     The Roll-up Transaction should not have altered the distribution of the economic interests in the Operating Companies between Imperium and the non-Imperium investors. Imperium owned approximately 55.6% of the value of the Operating Companies prior to the Roll-up Transaction, and it should have owned the same percentage afterwards. Indeed, in the run-up to the Roll-up Transaction, Defendants told the non-Imperium investors that they would have the same interest in the Operating Companies post-transaction as they did pre-transaction. That representation was knowingly false.

46.     Unbeknownst to the non-Imperium investors, Defendants used the Roll-up Transaction to misappropriate, to themselves, around 6.5% of the value of the Operating Companies. That is, through the Roll-up Transaction, Imperium increased its ownership in the overall assets of the business from approximately 55.5% to 62%.

47.     There is no justification for Defendants' decision to award themselves (through Imperium) approximately 6.5% more of the value of the Operating Companies as part of the Roll-up Transaction for no consideration. Defendants valued the Operating Companies at around at the time of the Roll-up Transaction; thus, Defendants (through Imperium) effectively stole around 6.5% from Rhodium Enterprises. The Rollup Transaction should have resulted in Rhodium Enterprises owning approximately 44.4% of the economics of the Operating Companies, but Defendants' self-dealing caused Rhodium Enterprises to own only around 37.9%.

EXHIBIT A

Copy from re:SearchTX

### *Defendants' Other Frauds and Mismanagement*

48.      In 2021, Rhodium initiated plans to build-out a new, large bitcoin mining operation at the Temple Facility.[7] The Temple Facility was principally funded/controlled through Rhodium Renewables.   After Defendants shut-down an IPO following their own negligence,[8] sharp reduction in the price of bitcoin (as well as an impending bitcoin "halving" event), cost overruns, and regulatory issues, the substantial funding needed to build-out the Temple Facility was drying up.

49.      Desperate for Temple Facility funding, Defendants directed the movement of cash and assets (that could have been used to pay debt) from Rhodium-related entities, like Rhodium Encore. Rhodium Encore's cash and bitcoin holdings tumbled by approximately **95%** in just a few months from April 2022 to July 2022:

---

[7]      In April 2021, Defendant Nichols also represented that the Temple Facility had a favorable energy contract on similar terms to those at the Rockdale Facility, which was false.

[8]      Some of the Plaintiffs introduced Defendants to bankers for a SPAC and IPO, helped them engage world class PR and IR efforts, and provided feedback throughout the roadshow. Yet, due to critical missteps driven by Defendants' self-interest, the IPO was consistently delayed. Defendants' insistence on an Up-C structure, designed solely to benefit Imperium, delayed the S-1 filing and involved attempts to sell TRA credits to hedge funds. Furthermore, failure to pass Jefferies' audit committee, coupled with undisclosed insider equity sales through Imperium (both on the S-1 and to their bankers), further eroded investor trust. The S-1 filing in October 2021 triggered an IP violation claim for immersion cooling technology patent infringement – another issue Defendants concealed until it threatened their interests. The S-1 also resulted in Riot auditing Whinstone's payments versus what the Rhodium entities made in profits. Ultimately, Defendants canceled the IPO one day after receiving a demand letter from Rhodium 2.0 investors accusing them of securities fraud and self-enrichment. Instead of disclosing the claims to potential investors, Defendants lied claiming it was their duty to secure a higher valuation than the $1 billion being offered as part of the IPO. These actions, through which Defendants consistently prioritized personal gain over the interests of their investors, raise the question whether Defendants deliberately avoided raising $100-$150 million to close the IPO (while knowing the massive capital needs for the Temple facility) because Defendants already cashed out millions for their personal benefit in undisclosed private sales in 2021 and did not want to publicly disclose the potential for a lawsuit against them. The pattern is unmistakable: Defendants fraudulently induced Plaintiffs into making their substantial Investment so Defendants could set off on a course of unchecked self-dealing and self-enrichment.

**EXHIBIT A**

Copy from re:SearchTX



50.    Without that financial lifeline, the Temple facility could not have survived with depressed bitcoin prices and cost overruns. Defendants continued transferring Rhodium Encore's cash to provide life-support to Temple/Rhodium Renewables up until the filing of the bankruptcy proceeding.

51.    But for the clear goal of Defendants to protect, and increase, their personal wealth at all costs, Rhodium Encore would have had enough liquidity to pay in whole (or substantially in whole) the Plaintiff's Notes upon maturity.

52.    Defendants mismanaged and defrauded Rhodium in numerous other ways, including: (i) Defendants embezzled $13.5 million to pay a "phantom tax" in 2021 (through retroactive changes to operating agreements, which opened the door for Defendants to engage in the shocking self-dealing of using Rhodium funds to pay their personal taxes), and (ii) Defendants usurping a corporate opportunity by purchasing miners at below market rates and then, off books, selling those miners at market rates, which resulted in Defendants pocketing an estimated $25

**EXHIBIT A**

Copy from re:SearchTX

million (at minimum) in profits that should have gone to Rhodium Encore.[9] The blatant self-dealing in which Defendants engaged truly shocks the conscience and knows no bounds.

53.     Plaintiffs, again, hope for action by the Rhodium debtors' estates to recover from Defendants for their mismanagement and negligence.  For Plaintiff's purposes, importantly, but for Defendants' lies, Plaintiffs would not have invested in Rhodium in the first place. Defendants should be held personally liable for intentionally procuring an investment from Plaintiffs through their rampant and intentional fraud.

<u>**CAUSE OF ACTION: FRAUD/FRAUDULENT INDUCEMENT/FRAUD BY NONDISCLOSURE
(THE RIOT TRANSACTION)**</u>

54.     Pursuant to Texas state law, a cause of action is pled against Defendants for fraud/fraudulent inducement/fraud by nondisclosure in relation to the Riot Transaction.  The allegations contained in all of the paragraphs of this Pleading are hereby reaverred and realleged, for all purposes, and incorporated herein with the same force and effect as if set forth verbatim herein.

55.     Defendants failed to disclose the Riot Transaction, which is material and which Defendants knowingly and intentionally withheld to induce Plaintiffs to make the Investment. Defendants knew that (i) Plaintiffs were unaware of the Riot Transaction (because Defendants intentionally withheld the information from Plaintiffs), and (ii) Plaintiffs did not have an equal opportunity to discover the withheld information. Defendants intended to induce Plaintiffs into making the Investment by concealing and failing to disclose the Riot Transaction. Defendants had

---

[9]     Defendants used investor funds to secure deposits on low-cost miners. When the Building D project vanished (as discussed herein) and Defendants had extra miners for delivery in 2021, Defendants exploited the price arbitrage by selling these miners (or the contract terms) at over three times the locked-in price – *solely for personal profit*. Estimated profits to Defendants are over $25 million and could be as high as $50 million. Later, when miner prices crashed, Defendants offloaded the entire $72 million miner impairment loss on their investors in a classic "heads I win, tails you lose" plot.

Copy from re:SearchTX

**EXHIBIT A**

a duty to disclose this material information to Plaintiffs. Had Plaintiffs known of the Riot Transaction, Plaintiffs would not have made the Investment. Plaintiffs have therefore suffered injury.

56.     Plaintiffs have been damaged by Defendants' actions, and Defendants are liable to Plaintiffs for all recoverable damages, including interest at the highest legal rate, attorneys' fees, and costs. Plaintiffs are also entitled to, and seek, an award of exemplary damages under Section 41.003 of the Texas Civil Practice and Remedies Code because the harm with respect to which Plaintiffs seek recovery of exemplary damages resulted from Defendants' fraud and malice

57.     Defendants are jointly and severally liable because they conspired together to accomplish their unlawful purpose.

### CAUSE OF ACTION: FRAUD/FRAUDULENT INDUCEMENT/FRAUD BY NONDISCLOSURE (THE ROLL-UP TRANSACTION)

58.     Pursuant to Texas state law, a cause of action is pled against Defendants fraud/fraudulent inducement/fraud by nondisclosure in relation to the Roll-up Transaction.  The allegations contained in all of the paragraphs of this Pleading are hereby reaverred and realleged, for all purposes, and incorporated herein with the same force and effect as if set forth verbatim herein.

59.     Defendants made the Roll-up Fraudulent Statements and other misrepresentations, which are material misrepresentations that they knew were false when they made them or that they made recklessly without any knowledge of their truth and as a positive assertion. Defendants made the material misrepresentations with the intent that the Plaintiffs act upon them, and Plaintiffs acted in reliance on the misrepresentations and suffered injury.

EXHIBIT A

Copy from re:SearchTX

60.     Plaintiffs have been damaged by Defendants' actions, and Defendants are liable to Plaintiffs for all recoverable damages, including interest at the highest legal rate, attorneys' fees, and costs. Plaintiffs are also entitled to, and seek, an award of exemplary damages under Section 41.003 of the Texas Civil Practice and Remedies Code because the harm with respect to which Plaintiffs seek recovery of exemplary damages resulted from Defendants' fraud and malice.

61.     Defendants are jointly and severally liable because they conspired together to accomplish their unlawful purpose.

## CONDITIONS PRECEDENT

62.     All conditions precedent to Plaintiffs' claims for relief have occurred and been satisfied or have been excused or waived.

## RULE 193.7 NOTICE

63.     Pursuant to Rule 193.7 of the Texas Rules of Civil Procedure, this shall serve as actual notice that Plaintiffs intend to use produced documents against Defendants in pretrial proceedings and at trial. Accordingly, production of a document or documents in response to discovery requests by Defendants authenticates the document or documents for use against the Defendants in any pretrial proceeding or at trial unless they object to the authenticity of any produced document or documents within the time limits particularly set out in Rule 193.7 of the Texas Rules of Civil Procedure.

## MISCELLANEOUS

64.     The right to plead any and all claims, causes of action and/or theories in the alternative is invoked and all claims, causes of action, and/or theories of recovery are hereby pled, in the alternative, to the extent necessary. The right to bring additional causes of action against and to amend this Action as necessary is hereby specifically reserved.

**EXHIBIT A**

Copy from re:SearchTX

## **PRAYER**

Therefore, based on the foregoing, Plaintiffs respectfully request the following relief from

the Court:

a) Judgment in favor of Plaintiffs against Defendants, jointly and severally, for all actual damages, compensatory damages, exemplary damages, reasonable attorney's fees, reasonable paralegal fees, costs of court, and pre- and post-judgment interest at the highest rate allowed by law;

b) All further relief whether general or special, at law or in equity, to which Plaintiffs show themselves to be entitled.

Respectfully submitted,

*/s/ Chase J. Potter*

**CHASE J. POTTER**
Texas State Bar No. 24088245
potter@imcplaw.com
**JOSHUA J. IACUONE**
Texas State Bar No. 24036818
josh@imcplaw.com
**ANNA OLIN RICHARDSON**
Texas State Bar No. 24102947
anna@imcplaw.com

**IACUONE MCALLISTER POTTER PLLC**
Energy Square One
4925 Greenville Ave., Suite 700
Dallas, Texas 75206
214.432.1536

**ATTORNEYS FOR PLAINTIFFS**

**EXHIBIT A**

Copy from re:SearchTX